1

2

3

4

5

6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

8

ROBERT DOUCETTE; BERNADINE
ROBERTS; SATURNINO JAVIER; and
TRESEA DOUCETTE,

9

Plaintiffs,

10

v.

C18-859 TSZ

11

DAVID BERNHARDT, Secretary of
United States Department of the Interior;
TARA SWEENEY, Assistant Secretary
– Indian Affairs; JOHN TAHSUDA III,
Principal Deputy Assistant Secretary –
Indian Affairs; and UNITED STATES
DEPARTMENT OF THE INTERIOR,

ORDER

12

13

14

15

Defendants.

16

THIS MATTER comes before the Court on (i) a motion for summary judgment,

17

docket no. 28, brought by plaintiffs Robert Doucette, Bernadine Roberts, Saturnino

18

Javier, and Tresea Doucette, and (ii) a cross-motion for summary judgment, docket

19

no. 31, brought by defendants United States Department of the Interior ("Interior"),

20

Interior Secretary David Bernhardt, Assistant Secretary Tara Sweeney, and Principal

21

Deputy Assistant Secretary ("PDAS") John Tahsuda IIII.  Having reviewed all papers

22

filed in support of, and in opposition to, the motions, the Court enters the following order.

23

**Background**

Plaintiffs were unsuccessful candidates for four open positions on the Nooksack Tribal Council, the governing body of the Nooksack Indian Tribe of Washington (the "Nooksack Tribe" or "Tribe"). They allege that, prior to the most recent change in presidential administrations, Interior had established a policy of "interpreting Tribal constitutional, statutory, and common law to determine whether the Tribal Council was validly seated as the governing body of the Tribe" for purposes of government-to-government relations. *See* Am. Compl. at ¶¶ 1-4, 24, 29, 31, 33, 39-40, 45, 47, 60-63 (docket no. 18). According to plaintiffs, in endorsing the results of primary and general elections conducted in the fall of 2017, defendants departed from Interior's previous policy.

Plaintiffs assert a claim under the Administrative Procedure Act ("APA") over which the Court has jurisdiction pursuant to 28 U.S.C. § 1331. *See Alto v. Black*, 738 F.3d 1111, 1124 (9th Cir. 2013); *Goodface v. Grassrope*, 708 F.2d 335, 338 (8th Cir. 1983). They seek a declaratory judgment, pursuant to 28 U.S.C. § 2201, that Interior's alleged "change in policy" was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A); *see also* Am. Compl. at § VII.A (docket no. 18). Plaintiffs ask the Court to require defendants to determine anew whether the elections at issue were held in compliance with the laws of the Nooksack Tribe. *See* Am. Compl. at §§ VII.B-C (docket no. 18). Although plaintiffs have standing to pursue such remedy, *see Chinook Indian Nation v. Zinke*, 326 F. Supp. 3d 1128, 1140 (W.D. Wash. 2018), the Court concludes that plaintiffs are not, as a matter of law, entitled to

such relief because Interior never adopted a policy of construing Nooksack law with respect to how Nooksack Tribal Council elections should be conducted, and defendants could not have behaved inconsistently with a non-existent policy.

In refusing, for a period of time before the 2017 elections, to recognize actions taken by the Nooksack Tribal Council, Interior did not purport to interpret Nooksack law concerning the manner in which elections must be administered, but rather effectuated the consequences to the Tribe of having failed to even hold an election before the terms of half of the council members expired. Moreover, during the course of and subsequent to the 2017 elections, Interior admirably balanced the deference it owes the Tribe, as a sovereign entity, with its responsibility to ensure that it deals only with a duty constituted governing body for the Tribe. Plaintiffs have not made the requisite showing to survive summary judgment, and their APA claim and this action are therefore DISMISSED with prejudice.

## A.    Composition of the Nooksack Tribal Council

The Nooksack Tribe has been federally recognized since 1973. Am. Compl. at ¶ 15 (docket no. 18). According to its Constitution, the Tribe's governing body is the Nooksack Tribal Council, which has eight seats, consisting of a chair, a vice-chair, a secretary, a treasurer, and four positions lettered A through D. _See_ Nooksack Const. art. III, § 2, Ex. N to Galanda Decl. (docket no. 12-14). The term of each council member is four years, with the tenure of the chair, secretary, and positions A and B staggered by two years from the tenure of the vice-chair, treasurer, and positions C and D. _Id._ at art. III, § 3. Thus, every other year, four positions on the Nooksack Tribal

Council are up for election.  At least five members of the Nooksack Tribal Council must be present at a meeting to constitute a quorum for transacting business.  _See_ Nooksack Bylaws art. II, § 4, Ex. N to Galanda Decl. (docket no. 12-14).

On March 24, 2016, the terms of the vice-chair, treasurer, and positions C and D expired without an election having been conducted to select persons to fill those seats.  _See_ Am. Compl. at ¶ 22 (docket no. 18).  These "holdover" council members continued to take actions on behalf of the Tribe, including attempts to disenroll certain individuals from the Tribe.  _See_ Order at 1-6 (docket no. 62), _Rabang v. Kelly_, No. C17-88-JCC (W.D. Wash. Apr. 26, 2017).[1]  On October 17, 2016, Lawrence S. Roberts, then Principal Deputy Assistant Secretary – Indian Affairs, wrote to Robert Kelly, Jr., then chair of the Nooksack Tribal Council ("Chairman Kelly"), and indicated that Interior "will only recognize those actions taken by the Council prior to March 24, 2016, when a quorum existed, and will not recognize any actions taken since that time because of the lack of a quorum."  AR 1.  PDAS Roberts reiterated this message in a letter dated November 14, 2016, stating that Interior will not recognize elections or actions that are inconsistent

---

[1] Five purportedly disenrolled individuals filed suit in this district, alleging that six of the eight members of the Nooksack Tribal Council and other tribal personnel violated the Racketeer Influenced and Corrupt Organizations Act ("RICO") in fraudulently depriving them of their tribal membership.  _See_ Compl. (docket no. 1) & Am. Compl. (docket no. 7), _Rabang v. Kelly_, No. C17-88-JCC (W.D. Wash.).  The RICO claims in _Rabang_ were eventually dismissed, _see_ Order (docket no. 166), _Rabang v. Kelly_, No. C17-88-JCC (W.D. Wash. July 31, 2018), and the former tribal members sought review.  The appeal in _Rabang_ has been stayed by the Ninth Circuit pending a decision in this matter.  _See_ Order, _Rabang v. Kelly_, No. 18-35711 (9th Cir. June 13, 2019).

with Nooksack law or the tribal court decisions in _Belmont v. Kelly_.[2]  _See_ AR 3-4.  In

correspondence sent on December 23, 2016, PDAS Roberts warned that the "lack of a

quorum and inability to take official action puts all Federal funding to the Tribe at risk."

AR 5.  PDAS Roberts further observed that Chairman Kelly and two "holdover" council

members had attempted to "anoint" themselves as the Tribe's supreme court, but had

taken such action without a quorum and in the absence of a valid election, so Interior

would continue to recognize only the decisions of the Northwest Intertribal Court

System, which then operated the Nooksack Tribal Court of Appeals.  _See id._

**B.      Memorandum of Agreement**

On August 25, 2017, Michael S. Black, then Acting Assistant Secretary – Indian

Affairs, entered into a Memorandum of Agreement ("MOA") with Chairman Kelly, the

purpose of which was "to provide and to outline a procedure whereby" the Assistant

Secretary (on behalf of Interior) would recognize a tribal council as the governing body

of the Nooksack Tribe.  _See_ AR 7-12.  The MOA indicated, however, that it was "not

---

[2] In _Belmont v. Kelly_, 272 then-enrolled members of the Nooksack Tribe brought suit in
Nooksack Tribal Court on behalf of themselves and their minor children to challenge efforts to
disenroll them.  On March 22, 2016, the Nooksack Tribal Court of Appeals refused to permit the
_Belmont_ defendants, which included Chairman Kelly, to file an interlocutory appeal from the
trial court's denial of a preliminary injunction that would have precluded the _Belmont_ plaintiffs
from voting in upcoming elections.  _Belmont v. Kelly_, No. 2016-CI-APL-001 (Nooksack Ct.
App. Mar. 22, 2016).  The Nooksack Tribal Court of Appeals reasoned that (i) "[u]nder the
Nooksack Constitution, an enrolled member of the Tribe is eligible to vote in elections,"
(ii) although the _Belmont_ plaintiffs might "eventually face disenrollment proceedings -- they are
currently enrolled members," and (iii) "[n]either the Constitution nor the Nooksack election code
prohibits an enrolled member from voting even where the member is the target of disenrollment
proceedings."  _See_ AR 6.

1  intended by the parties to be either binding or enforceable upon either party, nor

2  enforceable through an administrative process or in a court of law."  AR 10.  Under the

3  MOA, Acting Assistant Secretary Black provided interim recognition of Chairman Kelly

4  as "a person of authority within the Nooksack Tribe, through whom the Assistant

5  Secretary will maintain government-to-government relations with the Tribe for such time

6  as this MOA is in effect, for the purpose of the Nooksack Tribe holding a special election

7  and receiving funding under the Indian Self-Determination and Education Assistance

8  Act."  AR 8.  The interim recognition was to remain in effect until one of the following

9  three events occurred:  (i) the four vacant seats on the Nooksack Tribal Council were

10  filled via a valid election; (ii) the MOA was terminated for cause; or (iii) 120 days

11  elapsed after execution of the MOA.  *Id.*

12      In the MOA, Chairman Kelly committed to conduct an election within 120 days.

13  AR 7.  The election was to be held in accordance with the Nooksack Constitution and

14  Bylaws, as well as tribal laws and ordinances, and all eligible Nooksack voters would be

15  allowed to participate, regardless of county residency.  *Id.*  For purposes of the MOA,

16  eligible voters included individuals who were purportedly disenrolled since March 24,

17  2016.  AR 8-9.  The MOA provided that, if the Regional Director for the Northwest

18  Region of the Bureau of Indian Affairs ("BIA") endorsed the special election results, the

19  Assistant Secretary "shall issue a letter granting full recognition" of the Nooksack Tribal

20  Council as the "valid governing body" of the Tribe.  AR 8.

21

22

23

The Nooksack Tribe conducted a primary election on November 4, 2017, and a general election on December 2, 2017, AR 86, resulting in the Nooksack Tribal Council being composed of the following individuals:

| | |
|---|---|
| Robert Kelly | Chairman |
| **Richard "Rick" D. George** | **Vice-Chairman** |
| **Agripina "Abbie" Smith** | **Treasurer** |
| Nadene Rapada | Secretary |
| Robert "Bob" Solomon | Position A |
| Carmen Tageant | Position B |
| **Roy Bailey** | **Position C** |
| **Katherine Rose Romero** | **Position D** |

AR 668 (modified to show the newly elected members in bold font).

## C.  Recognition of Nooksack Tribal Council

Shortly after the MOA was signed, Interior itself had significant turnover.  In September 2017, PDAS Roberts, the author of three letters sent to Chairman Kelly in 2016, which plaintiffs contend established Interior's policy concerning the upcoming Nooksack Tribal Council elections, was replaced by defendant John Tahsuda III as Principal Deputy Assistant Secretary – Indian Affairs.  *See* Am. Compl. at ¶ 44 (docket no. 18).  In October 2017, Acting Assistant Secretary Black, who had executed the MOA on behalf of Interior, moved to the Bureau of Reclamation, and for some period of time thereafter, PDAS Tahsuda served as Acting Assistant Secretary – Indian Affairs. Defendant Tara Sweeney assumed the position of Assistant Secretary – Indian Affairs in August 2018.  *Id.* at ¶ 67.  Ryan Zinke, who appointed PDAS Tahsuda, resigned as Interior Secretary in January 2019 and was succeeded by defendant David Bernhardt, the current Secretary of the Department of the Interior.  *See id.* at ¶ 68.

On March 7, 2018, Twyla Stange, Acting Regional Director ("Acting RD") for the Northwest Region of the BIA, sent a memorandum to PDAS Tahsuda, in his capacity as Acting Assistant Secretary, endorsing the primary and general elections conducted on November 4, 2017, and December 2, 2017, respectively. AR 86-90. Acting RD Stange reported that the BIA had reviewed the declarations of Katrice Rodriguez (aka Romero), the Election Superintendent[3] for the Nooksack Tribe, dated September 7, October 7, November 21, and December 11, 2017, and January 16, 2018,[4] and concluded that the elections were conducted in accordance with the requirements set forth in the Nooksack Constitution and Title 62 of the Nooksack Tribal Code. AR 87 & 89-90.

---

[3] According to the Nooksack Constitution, prior to an election, the chair of the Nooksack Tribal Council must appoint a superintendent for the election, who may select two ballot clerks. Nooksack Const. art. IV, § 4, Ex. N to Galanda Decl. (docket no. 12-14). The superintendent and ballot clerks constitute the election board, which has the duty of supervising and certifying the election and resolving all election disputes. _Id._ For the primary and general elections at issue, Chairman Kelly appointed as superintendent Katrice Rodriguez (aka Romero), who is the twin sister of Katherine Romero (aka Canete), one of the candidates who ran in the race at issue. In her March 2018 memorandum to PDAS Tahsuda, Acting RD Stange noted that the Nooksack Tribal Code did not prohibit a family relationship between the Election Superintendent and a candidate (who was also the Tribe's general manager), AR 88, and she indicated that the BIA recognized Katrice Rodriguez as "the valid Election Superintendent vested with the powers to conduct and review this election," AR 87. Although plaintiffs previously raised concerns about Katrice Rodriguez serving as Election Superintendent, _see_ AR 88, 612, & 644, and about the qualifications of one of the two ballot clerks, _see_ AR 673, they do not pursue any claim in this litigation relating to the composition of the election board.

[4] The Election Superintendent's declarations are appended to Acting RD Stange's March 2018 memorandum as Attachments 1 (AR 93-189), 2 (AR 191-223), 3 (AR 225-73), 4 (AR 275-609), and 13 (AR 662-64).

In her March 2018 memorandum to PDAS Tahsuda, Acting RD Stange also addressed specific challenges to the election,[5] only one of which plaintiffs continue to advance in this case, namely that ballots were improperly cast in person, rather than by mail.  On this subject, Acting RD Stange offered the following analysis:

> A complaint was raised to the BIA alleging the ballot box was "stuffed" with illegal ballots cast in-person. . . .  The BIA was involved throughout the entire special election and closely inspected the election process. . . . [T]he BIA has reconciled the voters list and accounted for all ballots printed for the election.  The BIA inspected the ballot identification numbers of received ballots and determined they match up to the list of returned ballots.  There is neither evidence that ballots were cast by deceased individuals or people voting more than once, nor evidence that vote totals were altered.

AR 88-89.  Acting RD Stange, however, ultimately concluded that the question of whether ballots could be submitted by hand or had to be postmarked is "one of tribal law and the BIA declines to insert itself and interpret tribal law in this instance."  AR 89.

Acting RD Stange's unwillingness to interpret tribal law forms the basis of plaintiffs' claim for declaratory relief under the Administrative Procedure Act.  According to plaintiffs, Acting RD Stange's refusal to interpret tribal law constitutes an unexplained, and therefore arbitrary and capricious, departure from Interior's prior

---

[5] Acting RD Stange concluded that (i) individuals who reached the age of 18 after March 2016 were appropriately excluded because they would not have been eligible to vote when the election should have been held; (ii) the number of allegedly illegal votes (17) was less than the margin in the closest race (26), and therefore had no effect on the outcome of the election; (iii) despite assertions to the contrary, ballots were mailed to all eligible voters; (iv) no evidence supported the accusation that votes were procured through bribery; and (v) the Nooksack Tribal Code did not require that the tallying of votes be performed in public.  *See* AR 87-88.  In the matter now before the Court, plaintiffs make no contention that these determinations were arbitrary, capricious, an abuse of discretion, or inconsistent with Interior's policies and procedures.

policies, which were set forth in former PDAS Roberts's three letters to Chairman Kelly

in 2016, the MOA executed in August 2017, and a letter sent to Chairman Kelly in

September 2017 by Bodie Shaw, who preceded Twyla Stange as Acting Regional

Director for the Northwest Region of the BIA.[6]

On March 9, 2018, PDAS Tahsuda, exercising the authority of the Assistant

Secretary – Indian Affairs, signed a letter to Chairman Kelly, in which he recognized the

Nooksack Tribal Council.  AR 668.  PDAS Tahsuda indicated that the recognition would

extend until the results for the election originally scheduled for March 17, 2018, were

certified.  _Id._  On June 11, 2018, PDAS Tahsuda, again exercising the authority of the

Assistant Secretary, authored a letter to Roswell Cline, Sr., congratulating him on his

election as chair of the Nooksack Tribal Council and inviting him to participate in

"government-to-government consultation" regarding issues affecting the relationship

between the United States and the Tribe.  AR 669.  In their operative pleading, plaintiffs

allude to Chairman Cline's criminal history, _see_ Am. Compl. at ¶ 43 & n.3 (docket

no. 18), but they make no argument in this action that the election pursuant to which he

became chair was not properly conducted.

_____

[6] The parties have not included Acting RD Shaw's correspondence in the Administrative Record, but it was previously filed in response to defendants' unsuccessful motion to dismiss.  _See_ Ex. E to Galanda Decl. (docket no. 12-5).  In the September 2017 letter, Acting RD Shaw outlined a number of measures that needed to be implemented to conduct a valid election, including the appointment of a new Election Superintendent who did not have "a close personal or familial connection to any sitting councilmember or any so-called holdover council member."  _Id._ Although plaintiffs no longer contest the installation of Katrice Rodriguez as Election Superintendent, they have referred to Acting RD Shaw's letter as evidence of Interior's earlier policies concerning the interpretation of tribal law.

**Discussion**

**A.     Applicable Standards**

The Administrative Procedure Act requires the Court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A). The scope of review under § 706(2)(A) is, however, narrow, and the Court must refrain from substituting its judgment for that of the agency.  *Cal. Valley Miwok Tribe v. Jewell* [hereinafter *Miwok*], 5 F. Supp. 3d 86, 96 (D.D.C. 2013) (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  Agency action may be deemed "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" when (i) the agency has failed to provide a reasoned explanation, (ii) the record belies the agency's conclusion, (iii) the agency's rationale is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise," or (iv) the agency has inexplicably acted inconsistently with its prior decisions.  *See Organized Vill. of Kake v. U.S. Dep't of Agric.* [hereinafter *Kake*], 795 F.3d 956, 966 (9th Cir. 2015) (en banc); *see also Miwok*, 5 F. Supp. 3d at 96; *Seminole Nation of Okla. v. Norton*, 223 F. Supp. 2d 122, 131 (D.D.C. 2002).

Plaintiffs allege that, in recognizing the Nooksack Tribal Council as constituted after the November and December 2017 primary and general elections, Interior departed from its "established policy" of "interpreting Tribal constitutional, statutory, and common law to determine whether the Tribal Council was validly seated as the governing body of the Tribe" for purposes of government-to-government relations.  *See* Am. Compl. at ¶¶ 1

& 24 (docket no. 18).[7]  Defendants respond that Interior never adopted the policy

described by plaintiffs and that, even if Interior had such policy, defendants did not act

inconsistently with it.

Summary judgment should be granted if no genuine dispute of material fact exists

and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

The adverse party's evidence "is to be believed" and all "justifiable inferences" are to be

drawn in such party's favor.  _Anderson v. Liberty Lobby, Inc._, 477 U.S. 242, 255 (1986).

When the record taken as a whole could not, however, lead a rational trier of fact to find

for the non-moving party, summary judgment is warranted.  _See Beard v. Banks_, 548 U.S.

521, 529 (2006); _Matsushita Elec. Indus.  Co. v. Zenith Radio Corp._, 475 U.S. 574, 587

(1986); _see also Celotex Corp. v. Catrett_, 477 U.S. 317, 322-23 (1986).

**B.**     **Interior's Policies**

The concept of tribal sovereignty and self-determination dates back to at least the

framing of the Constitution itself.  _See_ U.S. Const. art. I, § 8, cl. 3; _see also Ransom v._

_Babbitt_, 69 F. Supp. 2d 141, 149 (D.D.C. 1999).  Congress has repeatedly articulated a

federal policy of promoting tribal self-sufficiency and economic development, and the

_____

[7] Plaintiffs do not contend that an agency may never alter its policies, but rather that, with respect
to any modification, the agency must (i) manifest its awareness about the change in position,
(ii) show that the new policy is permitted under the applicable statute, (iii) "believe" that the new
policy is better, and (iv) provide "good reasons" for the new policy.  _See Kake_, 795 F.3d at 966
(citing _FCC v. Fox Television Stations, Inc._, 556 U.S. 502, 515-16 (2009)); _see also Cayuga_
_Nation v. Bernhardt_, 374 F. Supp. 3d 1, 15 (D.D.C. 2019).  Plaintiffs assert that defendants have
not met this four-part test.  Because the Court concludes that Interior did not establish the policy
outlined by plaintiffs, it need not address whether defendants satisfied the criteria for changing
course.

courts generally construe federal law in a manner that will preserve tribal sovereignty and encourage tribal independence.  *See* *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 143-44 (1980).  When the federal government must determine, for purposes of its own interactions with a tribe, who or which entity it will recognize as having authority to act on behalf of the tribe, it must do so "in harmony with the principles of tribal self-determination."  *Ransom*, 69 F. Supp. 2d at 150.  Although the BIA must occasionally interpret tribal law to address this issue, such efforts should "effect as little disruption as possible" to tribal sovereignty and self-determination.  *Id.* at 151.

Interior must also bear in mind the unique trust relationship between the United States and Native American tribes.  *See* *Miwok*, 5 F. Supp. 3d at 96-97.  The BIA has a "strict and heavy burden" to administer federal funds to be distributed to tribal members in a manner that is consistent with the "highest fiduciary standards."  *Seminole Nation*, 223 F. Supp. 2d at 137-38.  The Interior Secretary has a duty to protect not only the tribe, but also individual tribal members, *id.* at 137, and must therefore ensure that the federal government deals only with "a duly constituted government that represents the tribe as a whole," *Miwok*, 5 F. Supp. 3d at 97; *see also* *Seminole Nation v. United States*, 316 U.S. 286, 296-97 (1942) (recognizing "the distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people," and observing that "[p]ayment of funds at the request of a tribal council which . . . was [known to be] composed of representatives faithless to their own people and without integrity would be a clear breach of the Government's fiduciary obligation").

With respect to the Nooksack Tribe, defendants and their predecessors have attempted to balance the deference due under principles of tribal sovereignty with the scrutiny required to fulfill their fiduciary responsibilities.  Indeed, in his letter dated October 17, 2016, former PDAS Roberts wrote:

> I want to be clear that the Department is not interpreting the Tribe's Constitution or interfering in internal tribal matters.  The Department fully respects tribal sovereignty and tribal law.  Rather, we are underscoring that pursuant to our government-to-government relationship between the United States and the Nooksack Tribe, we will only recognize action taken in accordance with the Tribe's Constitution and Bylaws.

> Under Federal law, the United States has a duty to ensure that tribal trust funds, Federal funds for the benefit of the Tribe, and our day-to-day government-to-government relationship is with a full quorum of the Council as plainly stated in the Tribe's Constitution and Bylaws.

AR 1-2.  In reiterating this position in his letters dated November 14, 2016, and December 23, 2016, PDAS Roberts quoted from the order issued on March 22, 2016, by the Nooksack Court of Appeals, which addressed attempts to preclude certain tribal members from voting before they had been legitimately disenrolled.  AR 3-4; AR 5-6. By relying on the decision of the Nooksack Court of Appeals, rather than his own understanding of tribal law, PDAS Roberts exhibited the requisite regard for tribal sovereignty, while making clear that continued efforts to circumvent the tribal courts' rulings and the legal prerequisites to disenrollment proceedings, including a proper quorum of the Nooksack Tribal Council, could result in a loss of federal funding and the BIA's resumption of law enforcement services on the reservation.  _See_ AR 5-6.

Similarly, the MOA does not purport to interpret Nooksack law, but rather refers to the decision of the Nooksack Court of Appeals in _Belmont v. Kelly_.  AR 8.  In the

MOA, Chairman Kelly, on behalf of himself and the Tribe, accepted the binding effect of the order entered by the Nooksack Court of Appeals on March 22, 2016. *Id.* Chairman Kelly and the Tribe further agreed that all tribal members purportedly disenrolled since March 24, 2016, were still members of the Nooksack Tribe and were entitled to vote in tribal elections, run for tribal office, and receive the benefits of tribal membership unless and until they were disenrolled by a mechanism that accorded due process and was consistent with Nooksack law. AR 8-9.

       In contrast to PDAS Roberts's correspondence and the MOA, Acting RD Shaw's letter dated September 7, 2017, displayed minimal deference to Chairman Kelly and the Nooksack Tribe, and instead set forth six directives aimed at conducting an election with results that Acting RD Shaw could endorse. Ex. E to Galanda Decl. (docket no. 12-5). None of Acting RD Shaw's directives, however, were derived from tribal law. Rather, they involved (i) issues addressed in the MOA, for example, the purported recall of council member Carmen Tageant, *see* AR 7, and Acting RD Shaw's directive to reinstate her within seven days, Ex. E to Galanda Decl. (docket no. 12-5 at 2, ¶ 1), and the "actual" provision of tribal benefits to purported disenrollees, *see id.* at 2, ¶ 4; (ii) logistics, for example, notifying purported disenrollees of their rights and a schedule for announcing the availability of and disbursing candidate packets, *see id.* at 2-3, ¶¶ 2, 3, & 5; and (iii) the appearance of unfairness associated with the appointment of Katrice Rodriguez as the Election Superintendent, *id.* at 3, ¶ 6. With regard to the last topic, Acting RD Shaw cited no provision of the Nooksack Constitution, Bylaws, or Tribal Code requiring

1    the selection of a different Election Superintendent, and he did not in any way suggest

2    that his directive was premised on an interpretation of tribal law.

3           In sum, none of the materials on which plaintiffs rely, namely the correspondence

4    of former PDAS Roberts, the MOA signed by former Acting Assistant Secretary Black,

5    and the letter sent by former Acting RD Shaw, articulated a policy of "interpreting Tribal

6    constitutional, statutory, and common law to determine whether the Tribal Council was

7    validly seated as the governing body of the Tribe." To the contrary, PDAS Roberts

8    explicitly disclaimed any attempt to interpret the Tribe's Constitution or interfere in its

9    internal affairs. _See_ AR 1. Moreover, even if Interior had operated under a policy of

10   interpreting tribal law, any such policy related only to substantive matters, _i.e._, who may

11   vote, as opposed to how they may vote, and who may take action on behalf of the Tribe.

12   _See United States v. One 1985 Mercedes_, 917 F.2d 415, 423 (9th Cir. 1990) (holding that,

13   to prevail on a claim that an agency "impermissibly departed from its own policy," an

14   aggrieved party must show _inter alia_ that the policy at issue prescribed a substantive rule,

15   and not an interpretive, organizational, or procedural rule); _see also Seminole Nation_, 223

16   F. Supp. 2d at 141 (to constitute "final agency action" for purposes of judicial review

17   under the APA, the action "must be one by which 'rights or obligations have been

18   determined,' or from which 'legal consequences will flow'"). Because Interior did not

19   establish a policy of construing the Nooksack Constitution, Bylaws, and/or Tribal Code

20   with respect to how Nooksack Tribal Council elections should be conducted, Acting

21   RD Stange's subsequent refusal to "interpret trial law" with regard to whether ballots

22   could be submitted by hand or had to be postmarked, _see_ AR 89, was not inconsistent

23

1    with Interior's prior policies.  Plaintiffs' contention that Acting RD Stange's endorsement

2    of the 2017 election results and PDAS Tahsuda's recognition in March 2018 of the

3    Nooksack Tribal Council flowed from an improper "change in policy" lacks merit.

4    **C.**     **Interior's Supervision of the 2017 Elections**

5            Contrary to plaintiff's assertions, Interior appears to have "stayed the course"

6    throughout the election process.  While showing respect for the Tribe and its election

7    officials, the BIA closely monitored the situation.  On three separate occasions, Richard

8    Ferguson, Acting Realty Officer for the BIA Puget Sound Agency, traveled to Deming,

9    Washington to observe activities related to the primary election held on November 4,

10   2017.  _See_ AR 647, 649, & 651.  On his first visit on October 6, 2017, while working

11   with Katrice Rodriguez, Nooksack's Election Superintendent, Officer Ferguson

12   personally sealed approximately 95% of the outgoing primary ballots, and he witnessed

13   the sealing of the other 5% and the verification of 100% of the ballots.  AR 647.  He also

14   personally carried all of the ballots to the post office for mailing.  _Id._  On his second and

15   third trips, on October 26 and November 2, 2017, respectively, Officer Ferguson met

16   with Election Superintendent Rodriguez and Nooksack Tribal Police Chief Michael Alby,

17   accompanied them to the post office to collect the ballots received that day, witnessed the

18   recording of such ballots in the election database, and viewed the evidence vault where

19   ballots that had been cast were being secured until the date of the primary election.

20   AR 649 & 651.

21           Officer Ferguson made another journey to Deming on November 28, 2017, during

22   the general election process.  AR 656-57.  He observed five tribal members receive

23

replacement ballots from Election Superintendent Rodriguez. AR 656. Replacement ballots were available to tribal members whose ballots had been lost or otherwise spoiled or had been returned to the Tribe as undeliverable. *Id.*; *see also* AR 156 (Nooksack Tribal Code § 62.06.020(B)(4)). With respect to lost or spoiled ballots, the tribal member was given the option of mailing the replacement ballot at his or her own expense or handing it to Police Chief Alby to carry to the evidence vault. AR 656. If the original ballot had been returned as undeliverable, the tribal member was instructed to mail the replacement ballot using the postage paid envelope included in the replacement packet. *Id.* A total of 56 replacement ballots were issued. Ex. C to Rodriguez Decl., AR 302-11; *see also* Rodriguez Decl. at ¶ 10, AR 663. Ballots for the general election were sequentially numbered, and a log was kept of which ballot was mailed to each tribal member eligible to vote and of any replacement ballot issued to a tribal member. *See* Ex. B to Rodriguez Decl., AR 287-300.

During his visit on November 28, 2017, Officer Ferguson attended a "ballot party" at the Nooksack community center in Everson, Washington. AR 656-57. A United States Postal Service ("USPS") staff member was also at the "ballot party," and Officer Ferguson saw the postal worker collect between 12 and 16 ballots, indicating that they would be processed as though they had been deposited into a USPS mailbox. *Id.* According to Officer Ferguson, Election Superintendent Rodriguez disavowed any connection between the "ballot party" and the election board. AR 656.

On the date of the general election, December 2, 2017, Officer Ferguson and Marcella Teters, Superintendent of the BIA Puget Sound Agency, traveled to Deming to

monitor the tallying of the ballots. AR 653. Of the 1,536 ballots originally mailed, for which 56 replacements were issued, a total of 812 ballots were cast. _See id._ & AR 663. According to Superintendent Teters, the ballots were opened in her presence, the identifying numbers were cut off the ballots, and the ballots were stacked. AR 653. Of the ballots received, 17 were deemed spoiled, 15 had not been placed in the provided secrecy envelope, and 2 were found in the same envelope. _Id._ The envelopes, as well as the numbers cut from the corners of the ballots, were retained. _Id._ The votes were then counted, and the ballots, along with the tally sheets, were transported to the Nooksack Tribal Police Department for safe keeping. AR 654.

After the BIA had reviewed the log of ballots for the 2017 general election, then Acting RD Shaw wrote to Chairman Kelly to inquire about unexplained gaps in the numerical sequence of ballot numbers. AR 659-60. Election Superintendent Rodriguez clarified that two typographical errors had been made on the log (1721 should have been 721, and 3196 should have been 316), that 44 ballots with the numbers 1535-1562 and 1603-1618 had not been used, that the ballot numbered 1637 was watermarked as a sample, and that no ballots were numbered above 1637. AR 663-64. On January 24, 2018, Superintendent Teters and Officer Ferguson went to Deming, retrieved the materials stored in the police vault, and verified (with a few exceptions) the information supplied by Election Superintendent Rodriguez. _See_ AR 666-67, Praecipe (docket no. 27-1). The 44 unused ballots and 56 replacement ballots were confirmed, as well as all but one of the ballots returned as undeliverable, which appears to have been misplaced. AR 666. The numbers cut from the corners of the ballots were analyzed,

with the following discrepancies identified: (i) two items were numbered 253; (ii) the corner of ballot number 1020 was discovered, but it had not been logged, and was likely mistakenly inputted as 120, which appeared twice on the list; and (iii) nine numbers were missing, which was consistent with receiving ballots from which the voters had already cut off the numbers. AR 667.

Given the amount of scrutiny and involvement the BIA had in the election process, the Court is persuaded that Interior more than satisfactorily discharged its duty to ensure that the Nooksack Tribal Council recognized by PDAS Tahsuda, in his role as Acting Assistant Secretary, was "duly constituted" and represented the Tribe "as a whole." <u>See</u> <u>Miwok</u>, 5 F. Supp. 3d at 97. Plaintiffs have speculated that, by accepting ballots in person rather than strictly by mail, Election Superintendent Rodriguez either enabled or engaged in ballot box "stuffing," and they accuse defendants of being dilatory for not insisting on ballots being returned via post and for not having a representative physically present when ballots were removed from their exterior envelopes. Plaintiffs, however, have had unfettered access to the logs of ballots for both the primary and general elections, which list, by tribal member and ballot number, the ballots that were mailed, the ballots that were returned as undeliverable, the ballots that were issued as replacements, and the ballots that were cast, but they have offered no evidence that any person assigned to a ballot that was counted did not in fact vote. Plaintiffs have not made any showing that defendants' actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and defendants are entitled to judgment in their favor as a matter of law.

## Conclusion

For the foregoing reasons, the Court ORDERS:

(1)     Plaintiffs' motion for summary judgment, docket no. 28, is DENIED, and defendants' cross-motion for summary judgment, docket no. 31, is GRANTED.

(2)     Plaintiffs' APA claim and this action are DISMISSED with prejudice.

(3)     The Clerk is directed to enter judgment consistent with this Order, to send a copy of this Order and the judgment to all counsel of record and to the United States Court of Appeals for the Ninth Circuit (re: _Rabang v. Kelly_, COA No. 18-35711), and to CLOSE this case.

IT IS SO ORDERED.

Dated this 9th day of August, 2019.

Thomas S. Zilly
United States District Judge